KEYBANK NATIONAL ASSOCIATION          CIVIL ACTION NO. 09-497-JJB

VERSUS

PERKINS ROWE ASSOCIATES, LLC, ET AL.

*Consolidated with*

KEYBANK NATIONAL ASSOCIATION          CIVIL ACTION NO. 10-552-JJB

VERSUS                                **THIS RULING PERTAINS TO CIVIL
                                       ACTION NO. 10-552-JJB ONLY**

THORNCO, L.L.C.

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

Before the Court is ThornCo, L.L.C.'s ("ThornCo") motion for summary judgment (Doc. 392)[1] and Keybank, N.A.'s ("KeyBank") competing motion for summary judgment (Doc. 394).  Oppositions (Docs. 401, 402) and reply briefs (Docs. 408, 409) were also filed.  There is no need for oral argument.  Jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332.

The parties seek a determination by this Court as to the ranking of security interests between ThornCo's construction liens and KeyBank's mortgage.  This security priority contest arises from the Perkins Rowe property in Baton Rouge, a large, mixed-use development integrating retail, residential and office components.  KeyBank maintains its mortgage ranks to September 14, 2005, while ThornCo asserts its liens

---

[1] All record citations refer to the lead case docket, Civil Action No. 09-497-JJB.

relate back even further in time to the first work performed on Perkins Rowe in late 2003 and early 2004.

Louisiana law provides that a subcontractor's lien outranks a bona fide mortgage if the lien was effective prior to the mortgage recording. The preliminary issue for decision is whether KeyBank may validly consolidate two separate mortgages it was assigned and still rank its consolidated mortgage from the date of the original mortgage. KeyBank asserts its consolidation of the Wachovia and JTS mortgages and notes is entirely proper based on Louisiana law regarding assignment of interests and mortgages to secure future obligations. ThornCo attacks the assignment of the Wachovia mortgage and note for a number of reasons discussed below.

The other issue is whether ThornCo's liens may relate back to work done prior to the effective date of KeyBank's mortgage. ThornCo has outstanding liens on Blocks B, C, G and H of the Perkins Rowe property. ThornCo asserts it may relate its liens back to not only predate the KeyBank consolidation on July 21, 2006, by virtue of ThornCo's subcontractor work for general contractor Echelon Construction Services, LLC, but also to predate Wachovia's mortgage because general contractor Lemoine Company had already begun work on the Perkins Rowe project.

## I. FACTUAL BACKGROUND

The owners of the development—Perkins Rowe Associates, LLC, Perkins Rowe Associates II, LLC, and related entities (collectively, "Perkins Rowe owners")—contracted with several general contractors to build different portions of the development at different times.

The first general contractor, Lemoine Company ("Lemoine"), was tasked with building a medical office building ("MOB") and also providing site work on Tract A-5, a separate portion of the Perkins Rowe property. (Lemoine Contracts, Doc. 402-1, pp. 2-3, 58-61). The relevant contracts were recorded in the East Baton Rouge Parish property records on August 25, 2003 (medical office building) and April 1, 2004 (site work). (*Id.*, pp. 3, 69). Lemoine recorded a bond for the MOB contract but not for the site work contract. (*Id.*, p. 69). Lemoine recorded notices of substantial completion of these projects on October 15, 2004 and January 26, 2005, respectively. (*Id.*, pp. 75, 77).

On September 14, 2005, a mortgage on certain parts of the Perkins Rowe property was recorded in favor of Wachovia Bank, N.A. (Wachovia Mortgage, Doc. 394-3, p. 5). The maximum principal amount of the mortgage was $200 million. (*Id.*, p. 6). The following day, an engineer filed a "no work" affidavit in the property records, stating that "no work regarding the improvement of the property had begun at the site and no materials had been furnished to said site within the past six (6) month period." (*Id.*, p. 40). However, the engineer noted that existing improvements "consisting of roadway paving, sanitary sewer and storm drainage collection system and associated utilities exist." (*Id.*).

On April 25, 2006, another mortgage on Perkins Rowe was recorded in favor of JTS Realty Services, L.L.C. (JTS Realty Mortgage, Doc. 394-3, p. 45). The parties agree this mortgage covered Block M of the development. (ThornCo Memo. in Supp., Doc. 392-2, p. 30; ThornCo Reply, Doc. 408, p. 21; KeyBank Memo. in Opp., Doc. 402, p. 17, n. 48). The maximum principal amount of the mortgage was $20 million. (JTS

Realty Mortgage, Doc. 394-3, p. 45).  A similar "no work" affidavit was filed by an engineer the next day.  (*Id.*, p. 70).

On June 9, 2006, Perkins Rowe executed promissory notes payable to Wachovia and JTS Realty—the Wachovia note for $1,000 and the JTS Realty note for $10,000— both of which became due on June 1, 2007.  (Promissory Notes, Doc. 394-3, pp. 2, 42).

On July 17, 2006, Echelon Construction Services, LLC ("Echelon") recorded several contracts and bonds for construction in Blocks A, D, E and F of Perkins Rowe. (Block A contract, Doc. 402-3; Block D contract, Doc. 402-3; Block E contract, Doc. 402-4; Block F contract, Doc. 402-4).

On July 21, 2006, both Wachovia and JTS Realty assigned their notes and mortgages to KeyBank, and KeyBank recorded the assignments the same day.  (Doc. 394-3, pp. 72, 78).  KeyBank then consolidated the notes (Consolidated Note, Doc. 394-3, p. 84) and the mortgages (Consolidated Mortgage, Doc. 394-4, p. 2) into new documents, each consolidation claiming it "amended, restated and consolidated" the previous documents.

Specifically, the KeyBank note states that it combined the Wachovia and JTS Realty notes "so that together they evidence a single indebtedness in the aggregate principal amount of this Note … but this Note does not extinguish or constitute a novation with respect to the indebtedness evidenced thereby…."  (Doc. 394-3, p. 87, ¶ 5).  The KeyBank note cites the construction loan agreement between Perkins Rowe and KeyBank and shows a principal indebtedness of $170 million.  (*Id.*, p. 84).

The KeyBank mortgage states in part that the prior Wachovia and JTS Realty mortgages "are hereby amended, restated and consolidated by this Mortgage and the

provisions of the Original Mortgages, as amended, restated and consolidated by this Mortgage constitute the full, true, complete and correct Mortgage between the parties with respect to" the Perkins Rowe property. (Doc. 394-4, pp. 26-27, ¶ 8.10). The consolidated mortgage shows a maximum principal amount of $500 million. (*Id.*, p. 6, ¶ 1.2).

On November 15, 2006, Echelon recorded contracts without bonds for construction of Blocks B and C of Perkins Rowe. (Block B contract, Doc. 402-5; Block C contract, Doc. 402-6). On February 23, 2007, it also recorded a contract without bond for construction of Block H. (Block H contract, Doc. 402-7).

In February 2007, ThornCo was hired as a subcontractor by general contractor Echelon on Blocks A-H of the Perkins Rowe development. (*See* Statement of Undisputed Facts, Doc. 392-1, ¶ 17-19; Thornton Deposition, Doc. 392-12).

On October 18, 2007, the Perkins Rower owners terminated a different general contract, EMJ Corporation, for its work on Block G, and Echelon proceeded to work on Block G without a contract, recording a certificate of substantial completion on November 29, 2007. (*See* Doc. 402-7 (notice of termination and certificate of substantial completion)).

In December 2007 and February 2008, ThornCo recorded construction liens totaling over $2 million for unpaid work on Blocks A-H. (Statement of Undisputed Facts, Doc. 392-1, ¶ 20; *see also* ThornCo Liens, Doc. 392-7). ThornCo eventually filed suit in state court, wherein a consent decree recognized the validity of the liens. (Statement of Undisputed Facts, Doc. 392-1; *see* Consent Judgment, Doc. 392-7, pp. 27-31). ThornCo received payment for its work on Blocks A, D, E and F, but the liens on Blocks

B, C, G and H remain unsatisfied. (ThornCo Reply Brief, Doc. 408, pp. 16-17, 23, n. 24). It is undisputed that ThornCo's outstanding liens are all located on property originally secured by the Wachovia mortgage.

## II. DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact." Fed. Rule Civ. P. 56(a). In their competing summary judgment motions, the parties contest essentially no facts. Instead, they urge competing visions for how the Court should apply Louisiana law to construe the facts buffering each party's claim.

A.     Keybank's Consolidation of the Wachovia and JTS Realty Mortgages

The Wachovia mortgage was recorded on September 14, 2005. The issue is whether KeyBank's consolidation of the mortgages destroyed its ability to claim priority arising from the Wachovia mortgage. Louisiana law on mortgages illuminates the principles at work here.

1. Governing Law on Louisiana Mortgages

A mortgage is a nonpossessory right created over property to secure the performance of an obligation. La. C.C. art. 3278. A mortgage is accessory to the obligation it secures. La. C.C. art 3282. Historically, to secure an obligation that had not yet arisen, parties in Louisiana were forced to resort to a collateral mortgage, but the legislature in 1991 altered the code to reflect a new iteration of a conventional mortgage—the mortgage to secure future obligations. "A mortgage may secure obligations that may arise in the future." La. C.C. art. 3298(A). This authorization did

away with the collateral mortgage requirement that the adjoining obligation supporting the mortgage be paraphed for identification to the mortgage.  La. C.C. art. 3298(C).

This new version of mortgage has remarkable vitality, as the code envisions this mortgage exists from its creation "until it is terminated by the mortgagor or his successor" or "extinguished[2] in some other lawful manner."  La. C.C. art. 3298(E).  The mortgagor may terminate the mortgage by giving "reasonable notice to the mortgagee when an obligation does not exist" or has not been incurred.  La. C.C. art 3298(D).  In other words, absent affirmative termination of the mortgage by the parties or by operation of law under Article 3319, the mortgage may continue indefinitely.  *See* La. C.C. art 3298, comments (e)-(f) (explaining duration of mortgage absent termination or legal extinguishment).  Thus, "the mortgage is fully in existence, though its enforcement may be conditional."  *Id.*, comment (f).  Moreover, "[a]s to all obligations, present and future, secured by a mortgage, *notwithstanding the nature of such obligations or the date they arise*, the mortgage has effect … as to third persons from the time the contract of mortgage is filed for registry."  La. C.C. art. 3298(B) (emphasis added).

This provision "declares that a mortgage securing future obligations has the same effect and priority it would have if the obligations were in existence when the contract of mortgage was entered into."  *Id.*, comment (c).  It is the burden of the mortgage holder to prove the effective date of the mortgage as to third parties.  *Tex. Bank of Beaumont v. Bozorg*, 457 So.2d 667 (La. 1984).

---

[2]  La. C.C. art. 3319 provides the methods by which a mortgage may be extinguished.  They include, *inter alia*, the destruction of the thing mortgaged, prescription of the obligations which the mortgage secures, consent of the mortgagee, discharge through judicial proceeding, or when all present and future obligations have been incurred and fulfilled.

KeyBank maintains the assignment of the Wachovia and JTS Realty mortgages to it were valid, the obligations which those mortgages secured were existent, and the subsequent consolidation of them into the KeyBank mortgage nonetheless allows it to relate back the effective dates of the consolidated mortgage to the recordation dates of the original mortgages. Because the mortgage holder bears the burden of proving the effective date of the mortgage, the Court must evaluate whether the assignment and consolidation caused KeyBank to lose any rights Wachovia held in its mortgage.

La. C.C. art. 2642 expresses a general policy which broadly supports assignment rights. La. C.C. art. 2645 makes clear that assigning a promissory note also transfers the mortgage securing the note. *See id.*, comment (b). Louisiana law supports the proposition that an assignee stands in the shoes of the assignor. *N.S.Q. Associates v. Beychok*, 659 So.2d 729, 734 (La. 1995). If the assignment is valid, then, KeyBank stands in the shoes of Wachovia and JTS Realty, respectively, for purposes of enforcing the mortgages. ThornCo contests both the validity of the assignments and also disputes the existence of any underlying obligation which would have supported the Wachovia mortgage. The Court treats each argument in turn.

2. Did Wachovia Assent to the Mortgage?

ThornCo argues that Wachovia never signed the mortgage and thus never gave assent to be bound. Louisiana law, however, does not require the mortgagee to sign the mortgage because consent is presumed and acceptance may be tacit. La. C.C. art. 3289. ThornCo also argues that it can overcome this evidentiary presumption of consent because there exists no affirmative act indicating consent by Wachovia, citing *Southern Enterprises, Inc. v. Foster*, 13 So.2d 491, 494 (La. 1943). It is difficult to find

support for the proposition that Wachovia did not assent to the mortgage. This is borne out by the *Expose de Motifs*, a publication that accompanied passage of Act No. 652 of the 1991 regular session of the Louisiana Legislature, which included among its provisions La. C.C. arts. 3289 and 3298. The *Expose* explains that Article 3289 did not require a mortgage to be signed by the mortgagee because it was simply codifying a "widely accepted commercial practice." *Expose de Motifs* III.A, *available at* LA LEGIS 652 (1991) (Westlaw citation).

Even assuming *Foster*'s requirement of an affirmative act to manifest consent to a mortgage remains good law, the Court finds the requirement met. The mortgage was recorded in the property records. (Doc. 402-1, p. 38). Wachovia received a promissory note which its mortgage secured, which was signed by a Wachovia representative. (Doc. 394-3, pp. 2-3).[3] ThornCo cannot overcome the strong presumption in favor of consent provided for in Article 3289, and thus no genuine dispute of material fact exists.

### 3. Is Wachovia's Alleged Failure to Lend Money a Failure of Cause?

ThornCo argues the Wachovia mortgage could not be legally established because no obligation ever existed for which the mortgage could serve as security.

---

[3] The Court must point out a seeming scrivener's error which exists in the Wachovia note. It describes the JTS Realty mortgage rather than the Wachovia mortgage when referencing the terms and conditions which the Perkins Rowe owners had to comply with to avoid default under the note. (*Compare* Wachovia Note, Doc. 394-3, pp. 2-3 (referencing mortgage as dated April 24, 2006 and recorded as Original 215, Bundle 11830) *with* Wachovia Mortgage, Doc. 394-3, p. 5 (dated September 12, 2005 and recorded as Original 526, Bundle 11764) *and* JTS Realty Mortgage, Doc. 394-3, p. 45 (dated April 24, 2006 and recorded as Original 215, Bundle 11830)). The JTS Realty Note, which was made the same day as the Wachovia note, includes the same description, which correctly references its mortgage. (Doc. 394-3, p. 42-43). *See also* La.R.S. 35:2.1 (providing for correction of clerical errors in notarial acts affecting immovable property).

This error, though, does not affect the validity of the Wachovia mortgage since it expressly secures "[p]ayment of all obligations … owing pursuant *to any note* … which is payable to [Wachovia]…." (Wachovia Mortgage, Doc. 394-3, p. 8) (emphasis added).

Comment (a) to La. C.C. art. 3298 clarifies that a mortgage to secure future obligations remains valid "even to secure obligations that may not then be contemplated by [the mortgagor] except in the broadest sense of an expectation that he may some day incur an obligation to the mortgagee." This mortgage thus survives attack for failure of cause unless it can be shown that no expectation of an eventual obligation existed at the time the mortgage was signed, or perhaps arguably ceased to exist at some time after the mortgage was entered. ThornCo asserts this failure occurred because Wachovia never intended to loan any money to Perkins Rowe following Hurricane Katrina. (ThornCo's Reply Brief, Doc. 408, p. 15 (citing Spinosa's deposition testimony)).

While Wachovia does not appear to have loaned money, negotiations were ongoing. KeyBank was also negotiating with Perkins Rowe at the time, and eventually they were assigned Wachovia's mortgage and thereafter loaned money. Undoubtedly the hurricane altered the landscape for construction loans in post-storm Baton Rouge, but the mere failure to lend prior to the assignment to KeyBank does not mean the possibility of lending had been wholly eradicated.

ThornCo simply cannot point to any evidence during this interval which shows Wachovia and Perkins Rowe ceased having a broad expectation that they might someday reach agreement on the terms of a loan. Both parties cite the sealed deposition testimony of Joseph T. Spinosa, who served as a representative for both JTS Realty and the Perkins Rowe defendants during the course of the project. (KeyBank Memo. in Opp., Doc. 402, p.14 (quoting Spinosa testimony)). The context of his statements, as KeyBank points out, makes clear that Wachovia and Perkins Rowe were engaged in substantial, ongoing negotiations about loan terms.

While ThornCo argues KeyBank had already essentially reached terms on a loan with Perkins Rowe, making the Wachovia loan unnecessary, that contention is simply irrelevant. The inquiry here relates to the intentions of the Perkins Rowe owners and Wachovia. Securing additional funding from KeyBank would not have precluded Wachovia from eventually lending. Until Wachovia assigned its interests to KeyBank, no evidence indicates it had forsaken the possibility of lending. ThornCo has not shown Wachovia and the Perkins Rowe owners ever wholly ceased to expect to incur a future obligation, and thus its failure of cause argument has no merit.

4. Were Wachovia's Mortgage and Note Mere Simulations?

ThornCo next argues that the note and mortgage were simply simulations devoid of legal effect. La. C.C. art. 2026 defines absolute simulations as contracts wherein "the parties intend that their contract shall produce no effects between them." However, even absolute simulations may be given effect if a third person has relied on a public record. La. C.C. art. 2028, comment (b). In this case, ThornCo attacks as a simulation the note and mortgage Perkins Rowe entered into with Wachovia. Yet it is readily apparent that KeyBank relied on the recorded documents when it received the assignments from Wachovia. Simulations cannot defeat good faith creditors and bona fide purchasers. *See* La. C.C. art. 2026, comment (c); La. C.C. art. 2028, comment (b).

More importantly, though, as the Court discussed previously, the parties did intend their contract to produce effects when it was entered. The intended effect of the mortgage was to secure the future obligations the parties expected to be created, namely, the construction loan for the Perkins Rowe development. While Wachovia's

loan never came to fruition, no evidence exists which tends to show the parties never intended the note and mortgage to have legal effect.

> 5.   Was Wachovia's Note a Sham Obligation?

ThornCo focuses most of its argument on this contention, and it is one that deserves attention.  ThornCo asserts the Wachovia note did not create real obligations such that the later assignment of the note was merely a sham transaction.  ThornCo thus asserts that, without a valid note underlying the mortgage, the mortgage assignment from Wachovia to KeyBank cannot stand, and KeyBank must thus rely on the date of the issuance of the consolidated note and mortgage.  In this scenario, ThornCo's liens would prime the KeyBank mortgage.

ThornCo is certainly correct that Louisiana jurisprudence has long held a mortgage only provides security to the extent there is an underlying obligation to secure. It points to a line of cases which all, in one way or another, support that point of law.[4] Article 3298 declares a policy demanding recognition of a mortgage at its date of recordation, regardless of when the obligation is actually incurred.  Of course, the obligation must eventually arise for the mortgage to be enforceable.  The Wachovia promissory note satisfies that requirement.  While ThornCo argues no evidence exists that funds were ever lent, it cites no authority which establishes the handing-over of money as a prerequisite to incurring an obligation.  Once the note was entered,

---

[4] *Li Rocchi v. Keen*, 134 So.2d 893, 898 (La. 1961) ("It is essentially necessary to the existence of a mortgage that there shall be a principal debt to serve as a foundation for it."); *Hortman-Salmen Co. v. White*, 123 So. 711 (La. 1929); *W.B. Thompson & Co. v. Union Sawmill Co.*, 46 So. 341 (La. App. 1908); *Aaron & Turner, L.L.C. v. Perret*, 22 So.3d 910 (La. App. 1st Cir. 2009); *Fairchild Development Co. v. Jackson*, 438 So.2d 664 (La. App. 2d Cir. 1983); *Guichard v. Greenup*, 259 So.2d 93 (La. App. 4th Cir. 1972); *Courshon v. Mauroner-Craddock, Inc.*, 219 So.2d 258 (La. App. 1st Cir. 1968).

Wachovia was obligated to advance the funds. The Wachovia mortgage was thus retroactively triggered and became effective for all purposes. Once Wachovia effectuated the assignment of the note and the mortgage, KeyBank stood in its shoes. KeyBank consolidated the Wachovia mortgage into a single writing, combining that mortgage with the JTS Realty mortgage. KeyBank executed a construction loan and advanced additional funds under the consolidated mortgage, which increased the amount of security the mortgage provided as the indebtedness of the Perkins Rowe defendants grew. These actions did not change the nature of the mortgage, either in its original or consolidated form, and they simply reinforce the underlying obligation incurred from the start via Wachovia's promissory note.[5]

  6. Was KeyBank's Consolidation of the Assigned Interests a Novation?

   ThornCo also argues that the assignment and consolidation of the notes and mortgages by KeyBank really constituted a novation. "A novation is the extinguishment of an existing obligation by the substitution of a new one." La. C.C. art. 1879. Novations cannot be presumed and must be shown by clear and unequivocal evidence. La. C.C. art. 1880. Thus, the burden of establishing a novation rests with the party asserting novation. *Scott v. Bank of Coushatta*, 512 So.2d 356, 360 (La. 1987). A change in the parties to an obligation is provided for in La. C.C. art. 1882, which covers subjective novations. It states that novation takes place only where "a new obligor is substituted for a prior obligor who is discharged by the obligee." La. C.C. art. 1882. Comment (d) to that article mentions a consideration worth repeating.

---

[5] Because the Court finds the Wachovia note to be valid, ThornCo's related argument—that a mortgage assigned without an existing obligation to secure is invalid—need not be addressed.

13

> [N]ovation by substitution of a new obligee is not provided for because the *effects of such a novation are readily achieved through an assignment* of credit. In modern law, the general acceptance of the notion of transmissibility of obligations has made novation by substitution of an obligee obsolete. (emphasis added).

This precept is confirmed by La. C.C. art. 2645, which allows for an assignment of a note with a concomitant assignment of a mortgage. As comment (b) to La. C.C. art. 2642 states, "an assignment is valid even without the debtor's consent, since, as a general rule, the identity of the creditor should be immaterial to the debtor who owes the performance involved."

ThornCo, however, points to *White Co. v. Hammond Stage Lines*, 158 So. 353 (La. 1934) as authority for its position that the assignment and consolidation created a novation. In that case, White Co. sold two busses and a Cadillac sedan to Hammond Stage Lines, receiving a vendor's lien and a chattel mortgage on each, represented by a promissory note on each as well. 158 So. at 353-54. After Hammond Stage Lines became in arrears on its payments, White Co. consolidated the debts on the three vehicles into one note. *Id.* at 354. White Co. then asserted vendor's liens and chattel mortgages on five vehicles – the three it had sold to Hammond Stage Lines plus two more busses which appeared to have already been owned by Hammond Stage Lines. *Id.* at 353-54. The consolidation also included a new notarial act of sale of the five vehicles. *Id.* at 354.

The Louisiana Supreme Court held that a novation had occurred because it inferred the parties' objective intent was to extinguish the former indebtedness from the three vehicles White Co. originally sold to Hammond Stage Lines and replace it with a consolidated note which evidenced a new indebtedness. *Id.* at 356. The most

14

convincing aspect, the Court found, was the sale of the five vehicles as evidenced by the notarial act of sale adjoining the new, consolidated note. *Id.* This could only be done by having the debtor, Hammond Stage Lines, convey the vehicles on which it owed money back to the creditor, White Co., who then reconveyed the vehicles back to Hammond Stage Lines. *Id.* In that way, White Co. gained additional collateral in the form of two new vehicles over which it could assert a security interest which it could not have on the old notes. *Id.* The combination of these actions amounted to convincing evidence that led the court to hold a landlord's lien, acquired after the original, separate notes (and attendant security interests) but before the consolidated note (with the expanded collateral), outranked White Co. *Id.*

Slightly different circumstances compelled the same court to hold the opposite only three years later. In *Union Bldg. Corp. v. Burmeister*, 173 So. 752 (La. 1937), the Louisiana Supreme Court distinguished *White Co.*, holding that no novation occurred. *Burmeister* concerned the sale of beauty parlor equipment to the defendant, who executed two notes and two chattel mortgages on the equipment to secure her payment. 173 So. at 753. After about three months passed, in order to satisfy a subsequent holder of her notes, the defendant executed a new note and chattel mortgage which added her debt from the prior two notes together and combined the equipment subject to the previous chattel mortgages into a single chattel mortgage. *Id.* at 753-54.

The *Burmeister* court found no intention to novate, either in the written agreements or through a promise by the creditor to return the original notes. *Id.* at 755. The court implied that the subsequent consolidation in *Burmeister* did not add to the

security already held by the chattel mortgage holder, unlike the transaction in *White Co.* *Id.* Most importantly, the court credited the representation by the note holder that it never intended a novation when it obtained the combined note and chattel mortgage. *Id.* The court also found significant the fact that the original notes, in addition to the combined note, were produced by the company seeking payment under them. *Id.*

This case appears to follow the facts of *Burmeister* much more closely than the facts of *White Co.* Here, KeyBank already held by assignment the rights to the collateral described in the Wachovia and JTS Realty mortgages. When it consolidated the assigned notes, KeyBank and Perkins Rowe agreed that the consolidated note did "not extinguish or constitute a novation with respect to the indebtedness evidenced thereby…." (Doc. 394-3, Ex. 9, ¶ 5). Thus, the most important consideration—the intent of the parties—clearly weighs against finding a novation. Moreover, unlike *White Co.*, no evidence exists here showing an additional round of conveyances between the creditor and debtor. As comment (g) to Art. 1881 notes, *White Co.* was correctly decided because the "opposite conclusion would have allowed the mortgagee to increase his security at the expense of another secured obligee." KeyBank here is not increasing its security interest in Perkins Rowe solely through the consolidation, as was attempted in *White Co.* Rather, KeyBank obtained the mortgages and notes from Wachovia and JTS Realty by valid assignment, then simply consolidated them into a single note and single mortgage. Each consolidation by KeyBank was merely an "execution of a new writing," which is exactly the type of "[m]ere modification of an obligation, made without intention to extinguish it, [that] does not effect a novation." La. C.C. art. 1881.

7.  Does Amending the Assigned Interests Create a New Obligation?

ThornCo argues that the amendments to the consolidated note create new obligations such that the consolidated note (and thus the consolidated mortgage) cannot relate back to the original Wachovia note and mortgage.  The original Wachovia mortgage secured a maximum aggregate principal amount of $200 million.  The consolidated KeyBank mortgage secured a maximum aggregate principal amount of $500 million.  However, the KeyBank consolidated note contained a maximum amount of only $170 million, which is less than the amount secured by the original Wachovia mortgage.

La. R.S. 9:5390(B) provides that amendments and modifications to security agreements are valid, but may rank from the date of the amendment's recording *if the amount of indebtedness increases.*[6]  The Wachovia mortgage allowed it to secure future obligations of up to $200 million.  The Wachovia note and KeyBank's consolidated note in the amount of $170 million, added to the JTS Realty note in the amount of $10,000, did not increase the amount of secured principal indebtedness of the Perkins Rowe defendants beyond the $200 million maximum aggregate principal

---

[6] That provision provides, in pertinent part, as follows:

> To the extent that the renewal or refinancing note or notes evidence an increase in the secured principal indebtedness [stated in the mortgage] (other than the increase that results from the conversion of unpaid accrued interest to principal), the mortgage with respect to the increase in the secured principal indebtedness shall rank from the date of the filing of an amendment to the mortgage reflecting the execution and delivery of such renewal or refinancing note or notes.

La. R.S. 9:5390(B).

stated in the original Wachovia mortgage.[7] This Court has already found that the amounts advanced under the KeyBank note amounted to $161,432,275.40 in principal. (Ruling on Right to Foreclose and Enforce Payment Guaranty, Doc. 397).

La. R.S. 9:5390 does not stand as an impediment to the validity of KeyBank's consolidated note and mortgage, especially when viewed in light of Article 3298. The Court finds the amendments and modifications to the previous notes and mortgages were not invalid and did not defeat KeyBank's right to use the date of the original Wachovia mortgage to determine its priority position. The Wachovia mortgage stated the maximum principal amount of the secured debt as $200 million, and KeyBank's obligations never surpassed that amount. Therefore, La. R.S. 9:5390 is not implicated here.

The Court therefore finds KeyBank received a valid assignment of interests from Wachovia and properly consolidated the Wachovia note and mortgage with the interests KeyBank received from JTS Realty. KeyBank's mortgage, as it pertains to ThornCo's liens

## B. ThornCo's Liens

To succeed in its summary judgment claim, ThornCo must prove that its lien claim predates and therefore outranks KeyBank's mortgage. To do so, ThornCo must establish that its lien was effective on or before September 14, 2005, the date KeyBank's mortgage ranks by virtue of the Wachovia mortgage recording. The only work alleged to have been performed prior to September 14, 2005, relates to the 1) site

---

[7] *See, e.g.,* Peter S. Title, 1 La. Practice Real Estate § 14:67 (2d ed.), *available at* LAPRAC-RE § 14:67 (Westlaw) (mortgage ranking affected only when underlying notes evidence indebtedness surpassing the maximum principal amount of the secured debt indicated in the mortgage).

work on Tract A-5, and 2) construction of the medical office building ("MOB"), both performed by Lemoine Company ("Lemoine").

      1.   Governing Law on Priority of Construction Liens and Mortgages

Under the Private Works Act ("PWA"), La. R.S. 9:4801 *et seq.*, subcontractors may secure their rights to payment against an owner and/or its general contractor for the price of their work by asserting a privilege in an immovable improved by their work. La. R.S. 9:4802(A)(1). The priority position for such a privilege is superior to a bona fide mortgage holder if the privilege arises and becomes effective prior to the mortgage. La. R.S. 9:4821(3)-(4); La. R.S. 9:4820(A).

The contractor's privilege becomes effective under the terms of La. R.S. 9:4820(A), which provides that work begins and the privilege attaches "by placing materials at the site of the immovable to be used in the work or conducting other work at the site of the immovable the effect of which is visible from a simple inspection and reasonably indicates that the work has begun." The section goes on to list certain actions that do not constitute the beginning of work for priority effectiveness purposes. *Id.* Section 4808(A) defines "work" generally as "a single continuous project...."

Under the statutory framework, however, there are several instances where certain acts performed by a contractor or subcontractor must be considered separate "work" that does not comprise part of the overall, continuous "work" project. First, section 4808(C) defines certain preliminary, preparatory work which does not become part of the overall work.[8] Similarly, section 4820(A)(2) defines the effective date for

---

[8] La. R.S. 9:4808(C) provides, in pertinent part:

"work" which later-arriving third parties may seek to use to relate back the effective date of their privilege.  That provision clarifies that, for the parties who did not participate in the preliminary site work, their later-acquired privileges do not relate back to the beginning of the preliminary site work; their privileges relate back only to the beginning of actual construction work (*i.e.*, work not defined as preliminary site work).  La. R.S. 9:4820(A)(2).  Thus, only the actual participants in the preparatory work may claim a privilege dating to that work.[9]  Preliminary site work performed by one contractor, which merely prepares the site for the actual construction of a building or other permanent structure to be performed by a different contractor, constitutes a separate work under the PWA.  La. R.S. 9:4808(C).  If the preliminary site work contractor also begins to erect the building or permanent structure, though, all the construction performed by the later contractor finishing the structure relates back all the way to the commencement of the preliminary site work.  *Id.*  The PWA thus contemplates a division of labor between contractors conducting initial, preparatory site work and contractors actually participating in the erection of a raised structure.

Second, an owner may by contract sever certain work from the overall work.  If a written contract and proper bond are recorded before the general contractor begins work, then the work performed under that contract is conclusively deemed separate

<hr>

The clearing, leveling, grading, … or performance of other work on land for or by an owner or the owner's contractor, in preparation for the construction or erection of a building or other construction thereon to be substantially or entirely built or erected by a contractor, shall be deemed a separate work to the extent the preparatory work is not a part of the contractor's work for the erection of the building or other construction.  The privileges granted by this Part for the work described in this Subsection shall have no effect as to third persons acquiring rights in, to, or on the immovable before the statement of claim or privilege is filed.

[9] *See* Michael H. Rubin, *Ruminations on the Louisiana Private Works Act*, 58 La. L. Rev. 569, 577-79 (1998) (providing examples of whose privileges date back to what work).

work from other portions of the overall project. La. R.S. 9:4808(B); *see also* La. R.S. 9:4807, comment (b); La. R.S. 9:4811 (requiring contract to be filed before work begins and to contain, *inter alia*, a legal description of property where work being done as well as a description of work to be done). This method also allows for delineation of multiple work sites within a single tract, even if only one general contractor is present. *See La. Nat'l Bank of Baton Rouge v. Triple R Contractors, Inc.*, 345 So.2d 7, 9 (La. 1977).

KeyBank also argues another situation, embodied in § 4820(B), exists for separating work—a thirty-day suspension of work. However, ThornCo correctly points out that § 4820(B) on its own terms only applies to work "for the addition, modification, or repair of an existing building or other construction." It is uncontested that no work pertinent to this litigation was performed for the purposes of adding, modifying, or repairing an existing structure. Perkins Rowe was a ground-up development, and therefore this case does not implicate that part of the statute.

Finally, KeyBank contends a notice of termination pertaining to a specified piece of land or a specified contractor separates that terminated work from the overall project, citing La. R.S. 9:4822(F), which provides:

> A notice of termination or substantial completion may be filed from time to time with respect to a specified portion or area of work. … This notice shall identify the portion or area of the land and certify that the work performed on that portion of the land is substantially completed or has been abandoned. *Once the period for preserving claims and privileges has expired and no liens have been timely filed, the portion or area of work described in the notice of termination shall be free of the claims and privileges of those doing work on the area described in the notice of termination, as well as those doing work elsewhere on the immovable being improved.* (emphasis added).

ThornCo, though, relying on Comment (f) to this subsection, correctly points out that this provision merely speeds up the limitations period for filing liens. Section

4822(F) says nothing about creating separate "work," and therefore this provision has no affect on whether—instead of when—a contractor may use that work to relate back the effective date of its lien.

### 2. Can ThornCo Relate Back to Lemoine's Initial Site Work on Tract A-5?

ThornCo argues Lemoine's work under its April 1, 2004 site work contract began the overall "work" on Perkins Rowe, which ThornCo claims permits its liens to date from that time. ThornCo points to the affidavit of David Drummond, a KeyBank employee, to establish that Lemoine did road work which benefitted KeyBank collateral. (Doc. 402-8, p. 128, ¶ 12). ThornCo also cites the no work affidavit submitted in conjunction with the Wachovia mortgage, which states that "[e]xisting improvements designated as 'Grand Avenue' consisting of roadway paving, sanitary sewer and storm drainage collection system and associated utilities exist." (Doc. 402-1, Ex. 9). ThornCo thus asserts Lemoine conducted not only preliminary site work but also installed certain infrastructure improvements such as water mains, storm drains, curbs, and road paving, which it claims rise beyond the preparatory work defined as separate work under La. R.S. 9:4808(C).

KeyBank argues a) the facts of the no work affidavit cannot be controverted, and thus as a matter of law La. R.S. 9:4820(C)[10] gives it priority by conclusively defeating

---

[10] Section 4820(C) states in pertinent part:

A person acquiring or intending to acquire a mortgage, privilege, or other right, in or on an immovable may conclusively rely upon an affidavit made by a registered or certified engineer … that states he inspected the immovable at a specified time and work had not then been commenced nor materials placed at its site, provided the affidavit is filed within four business days after the execution of the affidavit, and the mortgage, privilege, or other document creating the right is filed before or within four business days of the filing of the affidavit. The correctness of the facts recited in the affidavit may not be controverted to affect the priority of the rights of the person to

ThornCo's attempt to relate back to Lemoine's work performed prior to the no work affidavit; and b) all of Lemoine's work was done under recorded contracts which created a separate work under § 4808(B).

Comment (c) to § 4820 makes clear that while a no work affidavit does not itself grant priority, "the facts recited in the affidavit as to the nonperformance of work at the time of the inspection are conclusive and may not be controverted. The effect of such facts will be determined under the other provisions of the act." The Court must accept the facts recited in the no work affidavit as true, but it may analyze whether the "roadway paving, sanitary sewer and storm drainage collection system and associated utilities" constitute actual construction work or mere preparatory site work.[11]

The Court concludes that under § 4808(C), the work done by Lemoine was merely preparatory and must be considered a separate "work." Lemoine's work creating roads, drainage, and utilities differs in kind from the work that later contractors performed on the same site. Lemoine's work in this case was clearly a means to an end. Lemoine's work did not begin erecting the building or structure ultimately contemplated for the site. Instead, Lemoine—pardon the pun—paved the way for other

whom or for whom it is given, unless actual fraud by such person is proven. A person who gives a false or fraudulent affidavit shall be responsible for any loss or damage suffered by any person whose rights are adversely affected.

[11] ThornCo's reliance on *C&J Contractors v. Am. Bank & Trust Co.*, 559 So.2d 810 (La. App. 1st Cir. 1990) is misplaced. That court found that a lender's constructive knowledge of work done prevents reliance on the affidavit because "[i]t was not meant to provide technical immunity to mortgage holders that have actual knowledge that a project is well under way." *Id.* at 814. The legislature, however, amended the text in 1991 to allow lender reliance on the affidavit "unless actual fraud by such person is proven." La. R.S. 9:4820(C). This implicitly overruled *C&J Contractors* on that point of law. Rubin, 58 La. L. Rev. 569, at 605 ("It would appear that under the revised version of [§ 4820], the result of the *C&J Contractors* case today would be different."). There is simply no evidence of actual fraud committed by Wachovia.

contractors to raise the buildings which Perkins Rowe desired to be built on and around that job site. Lemoine's site work meets the statutory definition of preparatory work provided in § 4808(C), and therefore ThornCo cannot use that work as the basis for establishing the effective date of its liens.

3. Can ThornCo Relate Back to Lemoine's Contract for the Medical Office Building Construction?

Lemoine's work regarding the medical office building ("MOB") is even further insulated as a separate work. Lemoine recorded a contract for the construction of the medical office building on August 25, 2003, and recorded a notice of substantial completion on October 15, 2004. While it does argue that "Lemoine's work prior to the recordation of its [Tract A-5 site work] contract" renders the recordation of the site work contract invalid as a separate work under § 4808(B) because "Lemoine submitted an Application and Certificate for Payment to the Owners" showing work conducted prior to the site work contract's recordation on April 1, 2004," that contention is simply beside the point for purposes of this contract. (ThornCo Memo. in Supp., Doc. 392-2, pp. 15-16). Payments made on the *site work contract* before the site work contract was recorded only affect the ability of the site work contract to constitute a separate "work" under § 4808(B) by virtue of the failure to record the contract before work began. *See* La. R.S. 9:4811 (requirements adopted in La. R.S. 9:4808(B)). It does not affect the ability of the medical office building construction contract to qualify as a separate work under § 4808(B). ThornCo has brought forward no evidence that any work had begun on the *medical office building* project prior to the date that contract was recorded, and thus the technical timing requirements imposed in § 4808(B) via its incorporation of §

4811 are not implicated.  Section 4808(B) therefore operates to sever the work done under the medical office building contract from the rest of the overall Perkins Rowe development.

The medical office building construction contract and bond were recorded long before ThornCo alleges work under the site work contract (or any other contract) began, and the Court therefore has no evidence upon which to conclude the MOB contract was improperly recorded.  The work performed under the medical office building contract thus qualifies as a separate "work" under § 4808(B).  Since ThornCo performed no work on this separate medical office building project, § 4808(B) forbids ThornCo from availing itself of that work for ranking purposes.

No other work performed by any other contractor can operate to allow ThornCo to relate its lien back before the Wachovia mortgage.  All of the work performed by the other relevant general contractors, EMJ Corporation and Echelon Construction Services, LLC, including all of their recorded contracts, post-date the Wachovia mortgage and thus provide no anchor to which ThornCo may attach its liens.

### III. CONCLUSION; ORDER

The Court concludes KeyBank's mortgage has priority over ThornCo's liens.

Accordingly, the Court GRANTS KeyBank's motion for summary judgment (Doc. 394) and DENIES ThornCo's motion for summary judgment (Doc. 392).

ThornCo's counterclaim for declaratory judgment (Doc. 4 in No. 10-cv-552) is hereby DISMISSED with prejudice.

The parties shall submit a form of judgment.

Signed in Baton Rouge, Louisiana, on October 7, 2011.

_____

**JAMES J. BRADY, DISTRICT JUDGE**